```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: 9│22│0.5             │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    (ECF)
- - - - - - - - - - - - - - - - - - - -:
                                         :  05 MD 1661 (HB) (JCF)
In Re RIVASTIGMINE PATENT                :
LITIGATION (MDL No. 1661),               :     MEMORANDUM
                                         :     AND  ORDER
- - - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

        This multidistrict litigation concerns the patent rights for

rivastigmine tartrate ("rivastigmine"), the active ingredient in

Exelon, a medication marketed by Novartis Pharmaceutical

Corporation ("NPC") for the treatment of mild to moderate dementia

of the Alzheimer's type.  NPC, together with Novartis Pharma AG,

Novartis International Pharmaceutical Ltd., and Proterra AG

(collectively, "Novartis"), has brought actions alleging that the

defendants, Dr. Reddy's Laboratories, Ltd. and Dr. Reddy's

Laboratory, Inc. (collectively, "Dr. Reddy"), Watson

Pharmaceuticals Inc. and Watson Laboratories, Inc. (collectively,

"Watson"), and Sun Pharmaceutical Ltd. ("Sun") have induced

infringement of two patents owned by Novartis by seeking approval

from the Food and Drug Administration to market generic versions of

Exelon.[1]

_____

        [1] A more complete summary of the factual background of this
litigation is contained in my Memorandum and Order addressing

Two discovery disputes are currently pending.  First, the defendants seek to compel production of communications between representatives of the inventors of rivastigmine on the one hand and representatives of Novartis on the other.  Novartis objects on the ground that the communications in question are protected by the attorney-client privilege and argues that, because the inventors and Novartis had a common legal interest, they could share attorney-client communications without waiving the privilege. Second, the defendants seek disclosure of documents consisting of: (1) communications between Swiss patent agents and their clients, (2) communications between Swiss in-house counsel and their clients, and (3) communications between European patent attorneys and their clients.  Novartis opposes this application on the grounds that the defendants have failed to identify the specific documents at issue and that, in any event, the categories of communications referenced by the defendants would be privileged. I will address each of these issues in turn.

Communications Between the Inventors and Novartis

One of the two patents in suit is identified as United States Letters Patent No. 4,948,807 (the "'807 patent").  It claims a method of treating persons suffering from Alzheimer's Disease and

_____

Novartis' motion to amend the complaints.  In re Rivastigmine Patent Litigation, No. 05 MD 1661, 2005 WL 957426 (S.D.N.Y. April 25, 2005).

2

certain other conditions by administering N-ethyl, N-methyl-3[1-(dimethylamino)ethyl]phenyl carbamate, which is the chemical composition of rivastigmine. The '807 patent was issued to Marta Weinstock-Rosin, Michael Chorev, and Zeev Tashma, who conducted their research during 1982-1983 at Hebrew University in Israel. At some point, Yissum Development Corporation ("Yissum"), the licensing arm of Hebrew University, entered into discussions with Proterra AG ("Proterra") concerning commercial exploitation of the invention. Proterra was an entity controlled by Sandoz Ltd. ("Sandoz"), the predecessor of Novartis, and was the entity used by Sandoz to acquire these patent rights. In that connection, Sandoz provided Yissum access to its international network of patent attorneys to prosecute the necessary patent applications. The discussions resulted in an agreement dated December 8, 1986, in which Yissum assigned all rights in the invention to Proterra in return for certain specific payments as well as ongoing royalties. (Agreement dated Dec. 8, 1986, attached as Exh. 1 to Letter of Maurice N. Ross dated July 21, 2005 concerning common interest issue ("Ross 7/21/05 Letter-A")). Thereafter, Yissum and Sandoz entered into a second agreement dated December 23, 1987, setting the terms for cooperation in future research. (Agreement dated Dec. 23, 1987, attached as Exh. 6 to Letter of Diego Scambia dated Aug. 3, 2005, concerning common interest issue ("Scambia 8/3/05 Letter-A")).

Prior to any involvement by the plaintiffs, Yissum retained the Israeli law firm of Wolff, Bregmen & Goller to prosecute the original patent application in Israel. (Ross 7/21/05 Letter-A at 2; Deposition of Martin Lutz ("Lutz Dep."), excerpts attached as Exhs. 2, 3, 4, 5, 7, 8, 9, 10, and 11 to Ross 7/21/05 Letter-A, at 173-74). That application was filed on March 5, 1985, and was the priority counterpart to the application filed a year later in the United States Patent Office which resulted in the issuance of the '807 patent. (Ross 7/21/05 Letter-A at 2). Novartis had no involvement in the Israeli patent application. (Lutz Dep. at 89).

There were apparently communications between representatives of Novartis and the law firm that prosecuted the Israeli patent application on behalf of Yissum. These communications took place both before and after the assignment of rights to Novartis. (Letter of Maurice N. Ross dated August 5, 2005, Exh. A). As noted above, Novartis contends that these communications are privileged because they took place between one party and the attorneys for a second party with which the first party shared a common interest. The defendants argue that the common interest doctrine is inapplicable to the communications occurring after the assignment of rights, because at that point any common interest between Novartis and Yissum was only commercial, not legal. They further contend that, prior to the assignment, Novartis and Yissum were adversaries in a negotiation process and consequently did not share

a common legal interest.

A. Common Interest Doctrine

The attorney-client privilege protects from disclosure communications among clients and counsel made for the purpose of obtaining legal advice, provided that the communications were intended to be kept confidential and the privilege has not been waived. See United States v. International Brotherhood of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997); United States v. Doe (In re Six Grand Jury Witnesses), 979 F.2d 939, 943 (2d Cir. 1992); Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441 (S.D.N.Y. 1995). The burden of establishing each of the elements of the privilege rests on the party asserting it. See United States v. Doe (In re Grand Jury Proceedings), 219 F.3d 175, 182 (2d Cir. 2000); International Brotherhood of Teamsters, 119 F.3d at 214).

The common interest doctrine neither creates an independent privilege nor provides a separate basis for establishing the existence of an attorney-client relationship.

> Rather, it is an exception to the general rule that the privilege is waived when confidential information is communicated to a third party. If the third party and the client share a common legal interest, the rule applies and the privilege is not waived.

In re Federal Trade Commission, No. M18-304, 2001 WL 396522, at *2 (S.D.N.Y. April 19, 2001). In order for the doctrine to apply, the shared interest must be legal rather than commercial and identical

rather than merely similar.  See Bank of America, N.A. v. Terra Nova Insurance Co., 211 F. Supp. 2d 493, 496 (S.D.N.Y. 2002); Johnson Matthey, Inc. v. Research Corp., No. 01 Civ. 8115, 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002); Federal Trade Commission, 2001 WL 396522, at *3; Bank Brussels Lambert, 160 F.R.D. at 447. Thus, the doctrine "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation."   Bank Brussels Lambert, 160 F.R.D. at 447. Furthermore, it is not sufficient for the party seeking the protection of the common interest doctrine merely to show that a unified legal interest theoretically existed.  Rather, it must also demonstrate that the parties demonstrated cooperation in developing a common legal strategy. Federal Trade Commission, 2001 WL 396522, at *3; Bank Brussels Lambert, 160 F.R.D. at 447.

The common interest doctrine has routinely been applied in the context of patent litigation.  See In re Regents of the University of California, 101 F.3d 1386, 1389 (Fed. Cir. 1996); Sony Electronics, Inc. v. Soundview Technologies, Inc., 217 F.R.D. 104, 107-08 (D. Conn. 2002); Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., No. 95 Civ. 8833, 1998 WL 158961, at *2 (S.D.N.Y. April 1, 1998); Baxter Travenol Laboratories, Inc. v. Abbott Laboratories, No. 84 C 5103, 1987 WL 12919, at *1 (N.D. Ill. June 19, 1987).  However, "the Second Circuit has warned that expansions of the attorney-client privilege under the common interest rule

should be 'cautiously extended.'"  Federal Trade Commission, 2001 WL 396522, at *4 (quoting United States v. Weissman, 195 F.3d 96, 100 (2d Cir. 1999)).

B. Shared Interests

Novartis shared a theoretical legal interest with Yissum and the inventors at least up to the point where it acquired an assignment of all of the patent rights.  In Regents, the Federal Circuit found that a common legal interest existed between the University of California ("UC"), which owned the patent at issue, and Eli Lilly and Company ("Lilly"), which exercised an option to become the exclusive licensee.  The court held that "the legal interest between Lilly and UC was substantially identical because of the potentially and ultimately exclusive nature of the Lilly-UC license agreement.  Both parties had the same interest in obtaining strong and enforceable patents."  Regents, 101 F.3d at 1390. Similarly, in Bristol-Myers, 1998 WL 158961, at *1-2, the court found a community of interest between a patent owner and its exclusive licensee.

A community of interest may also arise, as in this case, among parties engaged in a joint program of developing technology and obtaining patents for it.  Thus, in Research Institute for Medicine and Chemistry, Inc. v. Wisconsin Alumni Research Foundation, 114 F.R.D. 672, 678-79 (W.D. Wisc. 1987), the court found the common interest doctrine applicable to communications between inventors

and the entity to which they assigned their patent rights. Likewise, in Baxter Travenol, the court found the doctrine applicable where the inventors and the manufacturer "were essentially engaging in a joint program of developing patents and technology[.]"  1987 WL 12919, at *1.  "A community of legal interests may arise between parties jointly developing patents; they have a common legal interest in developing the patents to obtain greatest protection and in exploiting the patents."  Id.; see also SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 514 (D. Conn. 1976).  In this case, even though Novartis and the inventors may have ultimately anticipated a transfer of the patent rights to Novartis exclusively, until that occurred they had a common legal interest in obtaining the patents in order to maximize the value of the property that would ultimately be conveyed.

This potential common legal interest is not diminished by the fact that, because Novartis was negotiating with the inventors and Yissum at this time concerning some future economic arrangement, some of their interests may have diverged.  Rather, the common interest doctrine would apply, but only insofar as their interests were in fact identical; communications relating to matters as to which they held opposing interests would lose any privilege.  See Baxter Travenol, 1987 WL 12919, at *2 ("The community of interest, however, extends only to communications relating to the prosecution and litigation of the patents, and not to those communications

8

relating to the parties' rights among themselves in the patents.").

Whether the inventors and Novartis continued to have a common legal interest after all patent rights were assigned to Novartis is more doubtful. At that point, the patent rights of Yissum and the inventors were extinguished, even though they continued to have rights to royalties. Such economic rights, standing alone, are generally not sufficient to support application of the common interest doctrine. See Johnson Matthey, 2002 WL 1728566, at *6-7 (one party having ceded its rights in patent, "[t]he shared desire to maximize royalty income is . . . simply a commercial concern" and does not "rise to the level of a common legal interest"); but see Research Institute, 114 F.R.D. at 678-79 (suggesting that inventors who had assigned patents nevertheless had common interest with assignee because of continuing right to share in royalties and fees). This issue need not be finally resolved, however, because Novartis has failed to satisfy the second prong of the test for application of the common interest doctrine: it has not demonstrated that, as a practical matter, it ever pursued a common legal strategy with Yissum and the inventors.

C. Demonstrated Cooperation

"'What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal.'" Federal Trade Commission, 2001 WL 396522, at *3 (quoting North River Insurance

9

Co. v. Columbia Casualty Co., No. 90 Civ. 2518, 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995)). While such cooperation may be definitively shown through a formal collaboration agreement, see United States v. United Technologies, 979 F. Supp. 108, 110 (D. Conn. 1997) (formal agreement to share legal advice for reducing tax liability), no such written documentation is required. See Power Mosfet Technologies v. Siemens AG, 206 F.R.D. 422, 425 (E.D. Tex. 2000). "However, parties relying on an oral agreement run the risk that the Court can not determine when or if an agreement was reached." Id.

In Research Institute, the court found evidence of common legal strategy in the assignment of patent rights:

> In the instruments by which the inventions were assigned to [the assignee], [the assignee] undertook to procure the patents and share the royalties and fees they produced. The inventors, for their part, agreed to cooperate in the prosecution of patent applications and any litigation involving the issued patents. These undertakings clearly contemplate the joint pursuit of legal advice and services with regard to obtaining and defending the patents.

114 F.R.D. at 678. By contrast, in this case, Novartis has proffered no agreement with Yissum or the inventors demonstrating a common legal strategy.[2] Nor has it provided any affidavit or

_____

[2] Novartis did submit an agreement between Sandoz and Yissum dated December 23, 1987. (Scambia 8/3/05 Letter-A, Exh. 6). This agreement, however, appears to deal with cooperation in future research rather than with the patents at issue, for which the research was conducted in 1982-1983.

deposition testimony describing any such strategy. Nor has it even described facts from which even an implicit common strategy could be inferred. Indeed, Novartis' own designated witness testified that there was no joint defense agreement and no "understanding that Yissum or Hebrew University or the inventors of the '807 patent would provide assistance to Novartis if requested." (Lutz Dep. at 74-75). Novartis has thus failed to carry its burden of demonstrating the applicability of the common interest doctrine. See Bank Brussels Lambert, 160 F.R.D. at 448 ("In the absence of some evidence of a coordinated legal strategy, the presence of . . . a concern about litigation does not bring a disclosure within the common interest doctrine."); Baxter Travenol, 1987 WL 12919, at *2 (agreements to hold information confidential in hope of some future agreement regarding patent rights not sufficient to show mutual interest). Accordingly, any privilege that might otherwise attach has been waived with respect to communications between Novartis and representatives of the inventors, and any documents reflecting such communications shall be produced.

Communications with Foreign Patent Agents and In-House Counsel

The defendants also seek a ruling that communications between Novartis on one hand and its in-house counsel in Switzerland or Swiss or other European patent agents on the other are not subject to the attorney-client privilege and must be disclosed. (Letter of Maurice N. Ross dated July 21, 2005, concerning foreign patent

agent issue). The difficulty with this application is that it does not focus on any specific documents. For several reasons, it is inappropriate to issue a decision addressing the defendants' arguments in the abstract. First, whether any given document is subject to disclosure may turn in part on which nation's law informs the determination of privilege. That, in turn, may depend on facts such as where the communication took place and whether it related to a patent application in the United States or in some other country. See Aktiebolag v. Andrx Pharmaceuticals, Inc., 208 F.R.D. 92, 97-98 (S.D.N.Y. 2002) (applying traditional choice-of-law "contacts analysis" to determine privilege law applicable to foreign documents); Madanes v. Madanes, 199 F.R.D. 135, 145 (S.D.N.Y. 2001) (considering role of foreign law in defining scope of privilege to be accorded communications between foreign attorney and client); Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 519-20 (S.D.N.Y. 1992) (working standard is that "'any communications touching base with the United States will be governed by the federal discovery rules while any communications related to matters solely involving [a foreign country] will be governed by the applicable foreign statute'") (quoting Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1169-70 (D.S.C. 1975)). Second, the applicability of the privilege may hinge on whether the patent agent or other non-attorney was assisting an attorney in communications with a client. See United States v.

12

Kovel, 296 F.2d 918, 922 (2d Cir. 1961); Golden Trade, 143 F.R.D. at 518-19; Baxter Travenol, 1987 WL 12919, at *8.  Third, any particular communication may not be privileged where the non-party was merely acting as a conduit for information between the client and some third-party, for example where a patent agent simply conveys client data to the patent office.  See Burroughs Wellcome Co. v. Barr Laboratories, Inc., 143 F.R.D. 611, 616-17 (E.D.N.C. 1992); Baxter Travenol, 1987 WL 12919, at *8.  Since the privilege determination is fact-sensitive, then, I decline to issue an advisory opinion that assumes any particular set of circumstances.

In order to create a record upon which the privilege issues can be decided, it is necessary for the defendants to obtain additional information about the documents at issue.  While Novartis's privilege log appears to identify each document with the specificity required by the discovery rules, it often does not provide information sufficient for adjudicating privilege.  (Letter of Maurice N. Ross dated Aug. 5, 2005, concerning foreign patent agent issue, Exh. 3).  The defendants shall therefore be permitted to seek that information by interrogatory.  While interrogatories are generally disfavored, see Local Civil Rule 33.3, here they are the most efficient means of seeking the information at issue.  The defendants may inquire not only about facts, but also about the plaintiff's contentions, such as Novartis's position as to which nation's law should govern the privilege with respect to any

particular document. Once the defendants have the necessary data, they may renew their motion, categorizing the documents in dispute according to the criteria relevant to the privilege determination.

Conclusion

For the reasons set forth above, the defendants' motion to compel production of communications between the inventors of rivastigmine or their representatives and Novartis is granted. Their motion to compel production of documents reflecting communications between Novartis and its in-house counsel or Swiss or other European patent agents is denied without prejudice to being renewed in connection with specifically identified documents.

SO ORDERED.

*James C. Francis IV*
_____
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           September 22, 2005

Copies mailed this date:

Robert L. Baechtold, Esq.
Diego Scambia, Esq.
Nicholas N. Kallas, Esq.
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, New York  10112-3801

Maurice N. Ross, Esq.
Stuart Sender, Esq.
Lars Taavola, Esq.
Budd Larner PC
150 John F. Kennedy Parkway
Short Hills, New Jersey  07078

James K. Stronski, Esq.
Frommer Laurence & Haug, LLP
745 Fifth Avenue
New York, New York  10151

James F. Hurst, Esq.
David J. Doyle, Esq.
Derek J. Sarafa, Esq.
Kristen G. Cowan, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL  60601